UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FLAMINGO LLC,
                        Plaintiff,

- against -

WENDY'S OLD FASHIONED HAMBURGERS
OF NEW YORK, INC., Successor -In-
Interest to Wenco Food Systems Corp.,
26 E. 23rd Street
New York, New York  10010,

                        Defendant.
------------------------------------X

NO. 11-CV-04862
(CM)(JCF)

AFFIDAVIT IN
OPPOSITION TO
DEFENDANT'S
MOTION FOR
SUMMARY JUDGMENT
AND IN SUPPORT OF
PLAINTIFF'S CROSS
MOTION FOR
SUMMARY JUDGMENT

STATE OF NEW YORK)
            ss.:
COUNTY OF NASSAU )

        Abe Shrem, being duly sworn, deposes and says:

        1.  I am the managing member of plaintiff Flamingo LLC, am fully familiar with the facts and proceedings had herein, and make the within affidavit in opposition to defendant Wendy's motion for summary judgment, and in support of plaintiff's cross motion for summary judgment.

        2.  That sometime in 2007, I was approached by Ira Shapiro ("Shapiro"), a developer who was desirous of purchasing the Flamingo Property for Slazer.  Prior to signing a contract of sale, Slazer entered into an agreement with Wendy's wherein Wendy's was to receive the sum of $2,250,000.00 to terminate its lease which termination was to be effective only at the time of the closing of the sale of the Flamingo Property to Slazer.  (Stipulated Fact No. 37) Thereafter, Slazer and Flamingo entered into a contract for the sale of the Flamingo Property, which property was being sold subject to Wendy's lease.  (Yecies Exhibit "J"; Stipulation Fact No. 60)

3. By reason of the fact that Slazer wanted to start work on the Flamingo Property as soon as possible, Slazer amended its agreement with Wendy's to provide that Wendy's was to vacate the property and receive its $2.25 million payment prior to Slazer's closing with Flamingo. (Yecies Exhibit "M") Thus, Wendy's vacated the property and received $2,25 million from Slazer.

4. Shapiro thereafter asked me for permission to demolish the upper two floors of the Flamingo Property prior to closing. As any rational person would have done, I told him that he could not do so, and that he could do whatever he wanted with the property after we closed. I did, however, give Slazer permission to do some preparatory work in the space where Slazer wanted to place a McDonalds. Inexplicably, without my permission, Slazer demolished the upper two floors of the Flamingo Property and ripped out all of the improvements on the first and second floor. Slazer also filed an easement on the Flamingo Property without my signature, knowledge, acquiescence or consent, enabling it to affix a heating flue from One Madison Park and onto the roof of the new second floor roof of the Flamingo Property. At his deposition at p. 84, line 10 - p. 83, line 15 (Yecies Exhibit "B"), Shapiro acknowledged that I was concerned about his removing two floors from the Flamingo Property. However, he did not specifically testify that I authorized the removal of the two floors. Upon further inquiry, he later testified that when I told him "do what you have to do", I was only referring to getting the deal done and

closed. (Shapiro transcript, p. 139, line 21 - p. 140, line 14) (Exhibit "1")

5. The closing of the Flamingo Property with Slazer kept getting adjourned and adjourned. However, I received extension and adjournment fees from Slazer, which increased the purchase price. (Yecies Exhibits "L", "N", "P" and "Q")

6. Prior to Slazer's filing for bankruptcy in June 2010, I did not demand back rent from Wendy's since Rider ¶27 to the contract of sale provided that Slazer would pay all rent arrears up until the time of closing. (Yecies Exhibit "J") Until Slazer's filing of bankruptcy in June 2010, I expected to close the sale of the Flamingo Property especially since Slazer had made a sizeable downpayment in the sum of $1,375,000, plus paid adjournment fees in excess of $1 million. Slazer also had paid Wendy's the sum of $2.25 million. I knew that Wendy's was always good for the money, and still is. Thus I was not concerned about the collectability of the rent in the unlikely event that the closing would not occur. My main concern was the closing which Shapiro repeatedly kept telling me would happen.

7. It is respectfully submitted that the document entitled "Amendment to Terminate Lease" is actually an assignment of the lease, wherein Slazer assumed all of its obligations and obtained possession of the Flamingo Property. (Yecies Exhibit "M") The Amendment also provided for a termination of the Wendy's lease to Slazer which would be effective only in the event of a closing of the Flamingo Property between Flamingo and Slazer. Pursuant to

3

¶25(b) of the Wendy's lease, Wendy's possessed the right to assign the lease without Flamingo's permission in the event of the closing of its business.

8. A true and correct copy of excerpts from the deposition transcript of Michael O'Kane dated January 10, 2012 is attached hereto as Exhibit "2". Mr. O'Kane, who was Wendy's in-house counsel involved in Wendy's dealings with Slazer, unequivocally acknowledges that any termination of the lease would take effect only upon the sale of the Flamingo Property. (O'Kane Transcript p.38 lines 7-24, p. 53 line 13- p.65 line 14; p.73 line 10 - p.74 line 13)

9. That pursuant to the terms of the lease, monthly fixed rent from November 2007 to October 2008 was due and payable in the sum of $24,248.80, and from November 2008 to October 2011 in the sum of $27,058.65. The last payment of fixed rent paid by Wendy's in the sum of $5,580.55 was paid in December 2007. In addition to fixed rent, Wendy's was required to pay real estate and related taxes. That from January 1, 2008 until December 30, 2011, the sum of $413,093.90 was paid for real estate taxes. (Stipulated Fact No. 106) These taxes were paid by Flamingo.

10. That between December 1, 2007 and May 1, 2012, the lease called for payments of fixed rent in the sum of $1,403,200.10. The lease also required the payment of real estate taxes in the sum of $413,093.90, for a total sum of $1,816.294. (Stipulated Fact No. 106)

11. In December 2007, Wendy's paid the sum of $5,580.55

4

in fixed rent. That from the time that Slazer assumed the Wendy's lease, it paid Flamingo real estate taxes required under the lease in the sum of $132,064.88. Thus, as of May 1, 2011, Wendy's is liable to Flamingo for fixed rent and additional rent in the sum of $1,678,648.57, plus interest and attorneys fees.

12. That when Slazer went bankrupt in June 2010, I had my attorney send to Wendy's a letter demanding back rent. (Stipulated Fact No. 128) Thereafter, a formal rent demand notice was sent in May 2011.

13. Pursuant to ¶13(a) of the Wendy's lease, the lessee was required to maintain the property in a reasonable condition. However, Slazer caused damage in the sum of $1,900,600 when he demolished and gutted the building, as set forth in the report of Edward Hiney, the expert hired by Wendy's. (Exhibit "3")

14. Annexed hereto as Exhibit "4" are excerpts of the deposition transcript of Richard Guarino, plaintiff's real estate expert. Mr. Guarino opined that, based upon his estimate of damages to the Flamingo Property in the sum of $1,900,000, that the reduction in the value of the property after Slazer took possession of the premises well exceeded the cost of restoration. (See Guarino Transcript, p.112, lines 9 -25)

15. Paragraph 42 of the lease limits Wendy's liability to the sum of $2 million. With the damage sustained to the property and the rents due and owing under the lease, plus interest and attorneys fees, the amount of money Wendy's owes Flamingo well exceeds said monetary cap on damages.

16. Pursuant to the various amendments to the contract of sale with Slazer, Slazer paid to Flamingo fees for adjournments of the closing date. In actuality, Slazer paid to Flamingo $1,415,011.61 in payments which included real estate taxes. (Stipulated Fact No. 74) As previously stated, the sum of $132,069.88 were amounts that Flamingo received for taxes, which I credited against the rent due from Wendy's under the lease. Thus, the total sum of extension payments received from Slazer was $1,282,941.93 which I designated on Yecies Exhibit "R" (Flamingo-1088) as "monthly increase in purchase price" (MIPP). These MIPP payments had nothing to do with any obligations in connection with the lease and were monies that Slazer owed Flamingo for adjourning the closing. These payments belonged to the owner of the property, and, thus, any claim of a setoff against rent due by Wendy's is specious. If the deal closed, Flamingo would be entitled to keep the adjournment fees as well as any arrearages in rent. (Yecies Exhibit "J") (See R11(a)(xi) of the Rider to Contract of Sale)

17. The Flamingo Property is now a partial shell which requires almost $2 million to restore. Although I have tried, I have been unsuccessful to date in finding someone to buy the building or to lease the premises. In fact, Wendy's will not even discharge the Memorandum of Lease filed with the City Register of the City of New York, making it more difficult to attract a tenant or buyer. The lease with Wendy's has never been terminated. Thus, rent is accruing monthly.

18. I am advised by my attorneys that summary judgment

searches the record. Accordingly, it is respectfully requested that Wendy's motion for summary judgment be denied and that plaintiff be granted summary judgment against Wendy's.

WHEREFORE, your affiant prays for an Order denying defendant's motion in all respects and for an affirmative order of summary judgment and awarding plaintiff damages in the sum of $2 million, and for such other and further relief as this Court may deem just and proper.

_____
Abe Shrem

Sworn to before me this
25th day of May, 2012.

_____
Notary Public

**BRUCE YUKELSON**
Notary Public, State of New York
No. 4518410
Qualified in Nassau County
Commission Expires Oct. 31, 2014