UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

FLAMINGO LLC,                                                                    NO. 11-CV-04862
                                             Plaintiff,                      (CM)(JCF)

      - against -

WENDY'S OLD FASHIONED HAMBURGERS
OF NEW YORK, INC., Successor -In-
Interest to Wenco Food Systems Corp.,
26 E. 23rd Street
New York, New York  10010,

                                      Defendant.
-------------------------------------------------------------X


**PLAINTIFF FLAMINGO LLC'S AMENDED STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT**


Bruce Yukelson
WOLFE & YUKELSON PLLC
14 Vanderventer Avenue
Suite 101
Port Washington, NY 11050
(516) 767-7100
*byukelson@wolfeyukelson.com*

Attorneys for Plaintiff
Flamingo LLC

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, plaintiff, Flamingo LLC ("Flamingo") states that there is no genuine issue to be tried with respect to the following material facts:

## STATEMENT OF UNDISPUTED FACTS

### The Property

1. In or about 1979, Shrem bought a property located at 26 East 23rd Street in Manhattan (the "Property").

2. The Property is one of Shrem's significant assets, and income derived from the Property has supported his family.

3. Before leasing the Property to Wendy's, the tenant was Kaysa Company. They operated a restaurant at the location.

4. Shrem went into the basement of the building and discovered that Kaysa was cooking in the basement and had removed some beams.

5. Shrem contacted the building department and other officials to take action against Kaysa.

6. Shrem evicted Kaysa from the premises.

### The Lease

7. In or about June 1990, Wenco Food Systems Corporation ("Wenco"), as lessee, and Abe Shrem, as lessor, entered into a triple net lease, contemplating that Wenco would operate a Wendy's restaurant on the Property. (Shrem Ex. 1.)

   a. The Lease, pursuant to § 39, is governed by New York law.

   b. The lease contemplated that Lessee would be responsible for:

    i.    Monthly fixed rent in the sum of $24,248.80 for year years 13 through 16 from the Commencement Date on the Lease; (§ 3)

    ii.    Monthly fixed rent in the sum of $27,058.65 from years 17 through 20 from the Commencement Date on the Lease; (§ 3);

    iii.    Real property taxes (§ 6);

    iv.    Utilities (§ 7);

    v.    "Fire and all risk insurance . . . for the full replacement value . . . The insurance policies shall be issued in the joint name of the Lessor and the Lessee as the insured . . . Each of such insurance policies shall carry an endorsement that before changing or cancelling any policy the insurance company issuing the same shall give the Lessor at least ten (10) days prior notice." (§ 8)

c.    The lease also contemplated that:

    i.    "In the event that any of the improvements on the Leased Premises are damaged or destroyed as a result of any casualty covered by the extended coverage insurance maintained by Lessee under Paragraph 8, Lessee shall, upon receipt of all insurance proceeds, with reasonable promptness repair, restore and reconstruct said damaged or destroyed improvements so that upon completion thereof said improvements will be substantially the same as before the occurrence of said damage or destruction." (§ 10.)

    ii.    "During the term of this Lease, Lessee shall maintain in reasonable condition the Leased Premises . . ." (§ 13(A))

d.    The lease further contemplated that:

    i.    Lessor was "solely responsible" for discharge of liens "caused by the acts or omissions of Lessor, its employees, agents, contractors, principals, and/or representatives" within 60 days of recording at "Lessor's sole cost and expense;" (§ 11(b)).

    ii.    Lessor was responsible, at its "sole and exclusive cost and expense," for "repair, reconstruction and/or restoration of the Leased Premises [] necessitated by the Lessor's negligence and/or the negligence of Lessor's agents, employees, contractors, principals and/or other representatives." (§ 13(b)).

    iii.    Lessor "covenants and agrees to use its best efforts to mitigate all damages." (§ 15(B)).

    iv.    If Lessor "shall fail to pay any charges upon any liens or mortgages executed or incurred by Lessor affecting the premises or breaches any representations and/or warranties or fails to perform any covenants or obligations required to be performed and/or observed by Lessor under the terms of this Lease . . .,"

3

   and Lessee attempts to "cure any such default and/or breach of Lessor hereunder and perform any covenants or obligations which Lessor has failed to perform and/or observe," "any sums expended by Lessee in curing such default or breach and/or performing such covenants or obligations shall be paid by Lessor to Lessee immediately upon demand, shall bear interest . . .and may . . . be offset" against rent payments.  (§ 15(D)).

 v. "Tenant shall have the right, without Lessor's consent, to assign this Lease or sublet all or any portion of the Leased Premises if such assignment or subletting is in connection with a reorganization of all or any portion of Lessee's business and/or is in connection with the bona fide sale, exchange, transfer or other disposition of all or any portion of Lessee's business . . ." (§ 25(B)).

 vi. "In the event of any litigation involving Lessor and Lessee, then the reasonable attorneys' fees incurred by the prevailing party shall be promptly paid by the other party (Lessor or Lessee, as the case may be) in such litigation."  (§ 37).

 vii. Lessor "represents, warrants, covenants and agrees" that "there are no easements, covenants, conditions, restrictions, rights-of-way of record or otherwise . . . which would prohibit or interfere with the construction or operation of Lessee's restaurant on the Leased Premises;"  (§ 16(A)(i)).

 viii. Lessor "represents, warrants, covenants and agrees" that, "Lessor has and will continue to have good and marketable fee simple title to the Leased Premises free and clear of all liens and encumbrances . . ." (§ 16(A)(iv)).

 ix. Lessor "represents, warrants, covenants and agrees" that, "No person, firm or entity has any rights in or to acquire the Leased Premises or any parts thereof including a right of first refusal or purchase option;" (§ 16(A)(vii)).

 x. Lessor "hereby covenants and agrees that Lessee shall, at all times during the original term of this Lease and any renewal term, have peaceable and quiet enjoyment and possession of the Leased Premises."  (§ 17).

 xi. "In the event that ingress/or egress to and  from the Leased Premises are totally or substantially blocked as a result of any road construction, sidewalk construction or other improvements, or if temporary use or occupancy of all or any part of the Leased Premises shall be lawfully taken by condemnation or in other manner for any public or quasi-public use or purpose during the term or then renewal term of this Lease, Lessee shall be entitled to receive the entire award for such temporary taking."  (§ 21(A)).

 xii. Lessee shall "have the option, in its sole and absolute discretion to terminate this Lease in which event Lessee and Lessor shall be released of all liabilities hereunder," "in the event that such total or substantial blockage or other temporary taking shall continue for an aggregate of 210 days or more during any 365-day period . . .  Any dispute arising under this Paragraph 21 shall be

4

        determined by arbitration in accordance with Paragraph 57 of the Rider." (§ 21(B) & (C)).

    xiii.    Lessor "covenants and agrees that during the initial term hereof and all renewal terms, that Lessor shall not . . . directly or indirectly engage in, or acquire any financial or beneficial [interest] in, or grant a lease to, or permit the occupancy by, any person, firm or corporation, which engages in the restaurant business having hamburgers as the major menu items" within a ten block radius. (§§ 38; 51).

    xiv.    Any "damages arising from" defaults by Lessee are limited "to a total cumulative amount for all such judgments . . . not exceeding two million ($2,000,000) dollars . . ."  (§ 42).

    xv.    "Lessee shall have the pre-emptive right during the term of this Lease and all renewal terms to purchase the Leased Premises, or lease a part or all of same, on the same terms and conditions as those of any bona fide offer received by and/or made by Lessor which is acceptable to Lessor, and Lessor, before making any sale or lease shall notify Lessee in writing of the terms and conditions of such offer (which notice shall include an executed copy of the Contract of Sale or Lease . . .) . . . " (§ 56).

8. On or about June 1990, Wenco filed with the City Register a Memorandum of Lease executed by the parties.

9. The parties subsequently amended the Lease a number of times, and the Lease was assigned to and assumed by Wendy's Old Fashioned Hamburgers of New York, Inc. ("Wendy's") in or about May 1996.

10. Abe Shrem, the managing member of Flamingo, deeded the Property to Flamingo in or about September 2005.

11. In or around December 2005, Flamingo sold its "Excess Development Rights" (including air rights) on the Flamingo Property to a third party for approximately $2,750,000.

12. Wendy's waived its right of first refusal provided by the Lease to purchase the Excess Development Rights in consideration for a payment.

13. From about June 1990 until on or about December 7, 2007, a Wendy's restaurant was operated on the Property.

14. From about June 1990 through December 2007, neither Wenco nor Wendy's was in default of its obligations as a tenant of the Property.

<u>Slazer Wanted to Purchase the Flamingo Property to Put in a McDonald's</u>

15. Ira Shapiro was a principal of Slazer and other related entities that were involved in real estate development.

5

16. In 2006, Ira Shapiro and Slazer purchased property (the "Slazer Lot") on 23rd Street just west of the Flamingo Property for development of a luxury condominium project, which later became known as "One Madison Park."

17. In early 2006, Shapiro and McDonald's were in discussions as to whether McDonald's had a right to place a restaurant within the Slazer Lot.

18. Around this time, Shapiro explored alternative locations for the McDonald's in the 23rd Street area, as he did not want a McDonald's to be in the lobby of his luxury condominium complex.

19. In 2006, Shapiro developed an interest in purchasing the Flamingo Property to put a McDonald's in the premises.

20. Since McDonald's only had a right to a two-story restaurant, Shapiro contemplated removing the top two floors of the Flamingo building and retaining the air rights for the top two floors, which were valuable.

21. In early 2007, Shapiro approached Shrem about Slazer purchasing the Flamingo Property.

22. Shapiro told Shrem that he did not want to have the McDonald's restaurant in his condominium development and wanted to put it in the Flamingo Property.

Slazer Began Construction on One Madison Park

23. Slazer began construction on its condominium complex, One Madison Park, in approximately February 2007.

24. During the spring and summer of 2007, Shrem was involved in securing roof protection on the Flamingo Property to protect it from construction by Slazer on the condominium complex.

25. At the time, Flamingo was the landlord and Wendy's was the tenant of the Flamingo Property.

26. Shrem and Andy Taves, a Real Estate Director at Wendy's, developed a friendly, social relationship during this timeframe, and Taves visited Shrem's home, the two spoke on the phone, and visited bars and restaurants on a few occasions.

Slazer Wanted Wendy's to Vacate and to Purchase Flamingo's Building

27. Shrem was interested in selling the Property to Shapiro and Slazer for $10 million plus three apartments in the One Madison Park condominium complex with a combined value of $3.75 million.

28. Shrem wanted to sell his building to Slazer.

29. Shrem wanted Wendy's to vacate the Property, so he could sell it to Slazer.

30. In the summer of 2007, Shrem introduced Shapiro to Taves of Wendy's, to see if Wendy's was interested in being bought out of the Lease and vacating the Property.

31. There was a meeting at a restaurant among Shrem, Shapiro and Taves to discuss the possibility of the Slazer entities buying Wendy's out of the Lease.

32. On or about June 18, 2007, Slazer made a written proposal to Wendy's to assign the Lease for $1,760,000.

33. At first, Wendy's was not interested in ending the Lease or vacating the Property at the price originally offered.

Wendy's Ceased Operations on the Property

34. Shrem knew that Wendy's was negotiating with Slazer to leave the Property.

35. After additional discussions and negotiations, prior to executing the Agreement to Terminate Lease, Wendy's agreed to cease operations and vacate the premises in exchange for a payment of $2,250,000.

36. Slazer and Wendy's – with the assistance of counsel – negotiated the terms for Wendy's vacating the premises. Flamingo's attorney, Jerome Strelov, was aware that these negotiations were ongoing.

37. On or about October 12, 2007, with Shrem's knowledge, Slazer and Wendy's executed an Agreement to Terminate Lease, in which Wendy's agreed to terminate the lease and surrender the Property upon the closing of the sale of the Property to 2623 Place (a Slazer entity) and in exchange for a $2,250,000 payment.

38. Taves forwarded an email to Shrem notifying him that Wendy's had executed the Agreement to Terminate Lease on that same day, October 12, 2007.

39. Wendy's executed a waiver of its right of first refusal to purchase the Property as to the sale of the Property to 2623 Place, a Slazer entity, pursuant to an exhibit to the Agreement to Terminate Lease, only in the event the lease terminated in accordance with the Agreement to Terminate Lease.

40. On November 9, 2007, Shrem wrote a letter to Michael O'Kane, in-house counsel at Wendy's at the time, stating, "As you have agreed to, Flamingo is currently negotiating with 2623 [a Slazer entity] to sell the Building to 2623 and we anticipate executing a contract next week with a closing in mid January 2008. At this time, prior to the closing of any such contract of sale, 2623 has no right or authority to terminate the Lease and my client does not consent to the proposed termination of the Lease . . ."

41. On November 21, 2007, Burt Dorfman, Slazer's counsel, sent a letter to Michael O'Kane, Wendy's in-house counsel, which was forwarded via email to Jerome Strelov (Flamingo's counsel), Ira Shapiro, and Marc Jacobs (Shapiro's development partner), agreeing that: (1) $2.25 million was deposited in escrow pursuant to the termination agreement; (b) the sum

7

of $1.375 million as a 10% down payment on the building was being held by Strelov; (c) the closing date was amended from November 27, 2007 to January 15, 2008; (d) Wendy's agreed to vacate the premises on or about December 7, 2007; and (e) Slazer agreed to be responsible for the rent from December 7, 2007 to the date of Closing.

42. On November 21, 2007, Flamingo's counsel, Jerome Strelov, emailed Burt Dorfman, Shapiro's counsel, and Michael O'Kane of Wendy's, copying Abe Shrem and Ira Shapiro that, "[a]t this time your clients have no right to terminate the Wendy's lease or accept or create any surrender or vacatur of the leased premises. If the closing occurs, your clients will of course, be free to make any arrangements with Wendy's it desires. I repeat that my client does not consent to any termination, surrender or vacatur of the Wendy's Lease and will continue to look to Wendy's for rent and additional rent."

43. On November 21, 2007, Burt Dorfman replied to Strelov, O'Kane, Shrem, and Shapiro stating, "My client cannot terminate the lease until the date of closing. That is understood by all. My client is paying the rent from the time Wendy's vacates (that does not constitute a surrender of the lease until closing in accordance with the Termination Agreement . . . The contract is not time of the essence. I do not want my client placed in a difficult position if you do not close on time for some unknown reason."

44. With Shrem's knowledge, Slazer negotiated a payment to Wendy's of $2.25 million in consideration for Wendy's ceasing operations and vacating the Property.

45. In or about November 2007, pursuant to the Agreement to Terminate Lease, Slazer placed $2.25 million in escrow for Wendy's as consideration for its agreement to cease operations and vacate the premises.

46. Flamingo's attorney, Jerome Strelov, on behalf of Flamingo, was included on written communications documenting this chain of events, including that $2.25 million had been deposited by 2623 (a Slazer entity) in escrow pursuant to the termination agreement, a sum of $1,375,000 as a 10% down payment on the building was presently being held by Strelov, the termination agreement was to be amended to reflect a January 15, 2008 closing date, and 2623 (a Slazer entity) would be responsible for rent on the Flamingo Property from December 7, 2007 or the date Wendy's vacated the premises until the date of closing between Flamingo and 2623 (a Slazer entity).

47. Wendy's ceased operations on the Property on or around December 7, 2007.

48. Wendy's paid no rent or additional rent to Flamingo after January 31, 2008.

49. On January 17, 2008, Burt Dorfman, Slazer's counsel, emailed Michael O'Kane, Wendy's in-house counsel, copying Ira Shapiro, notifying Wendy's that Slazer wished to "waive the condition of the closing date and direct the title company to make payment to Wendy's of the termination fee upon execution of agreed upon documentation." Dorfman also notified Wendy's that he hoped to finalize the closing with Flamingo in the next day or so.

50. On January 29, 2008, Slazer and Wendy's executed the First Amendment of Agreement to Terminate Lease, whereby Wendy's agreed to vacate the Property at that time, even though the closing between Flamingo and Slazer had not yet occurred, and Slazer agreed to assume

8

all obligations in relation to the Lease as of December 7, 2007 until the time of the purchase of the Flamingo Property by Slazer.

51. In an exhibit to the First Amendment of Agreement to Terminate Lease, Wendy's signed a waiver of its right of first refusal to purchase the Flamingo Property.

52. In the First Amendment of Agreement to Terminate Lease, Slazer confirmed that it had received possession of the Property, and Wendy's – who had since ceased operations and vacated the Property– confirmed that it delivered the keys to Slazer.

53. The First Amendment of Agreement to Terminate Lease states, among other things, that "Wendy's does not object to the Contract Purchaser with the permission of the Owner to begin construction and/or demolition on areas of the premises after the payment of the Termination Fee."

54. Around this time, Wendy's received the $2.25 million payment as consideration.

55. Shrem knew that the $2.25 million had been released to Wendy's even though the closing with Slazer had not yet occurred.

56. After Wendy's ceased operations and vacated the Flamingo Property in or around late January 2008, neither Flamingo nor Slazer contacted Wendy's for rent, taxes, expenses, or any other obligations in relation to the Property for almost two-and-a-half years.

57. Taves testified that "to [his] knowledge," Wendy's did not intend ever to return to the premises.

58. Taves spoke with Shrem socially several times after Wendy's departed from the Property, but Shrem never said that Wendy's owed rent or was responsible for any damage to the Property or had any other obligation in relation to the Property after Wendy's departure, but Shrem advised him that Flamingo and Slazer had not closed at that time.

Slazer Assumed the Obligations Under the Lease

59. Prior to Wendy's ceasing operations and vacating the Property, in or about November 2007, Flamingo executed a Contract of Sale to sell the Property to Slazer and affiliated entities for $13,750,000.

60. The Rider to that Contract of Sale stated, among other things, that: "the Premises are sold and shall be conveyed subject to the following . .. (xi) All rights of . . . ("Wendy's") pursuant to . . . (the "Lease") between Seller's and Wendy's predecessors-in-interest . . ."

61. Flamingo's attorney, Jerome Strelov, took custody of a 10% down payment on the Property of $1,375,000 from Slazer.

62. Shrem and Shapiro negotiated for Shapiro to provide three apartments in the condominium complex for Shrem's three daughters as part of the deal whereby Flamingo would sell its Property to Slazer.

63. Shrem and his daughters visited Shapiro's real estate office on 22nd Street to look at drawings and photographs of the apartments.

64. Shrem and his daughters subsequently visited the condominium complex with Slazer's representative to look at apartments and ultimately selected units 19A, 21A, and 7C.

65. Shrem's daughters were thrilled about the apartments.

66. Shrem executed purchase agreements with Shapiro and put down deposits for the apartments for his daughters in One Madison Park.

67. Shapiro ultimately returned these deposits to Shrem in or about April/May 2010 when a foreclosure action was filed against Slazer and various other entities which owned One Madison Park.

68. Flamingo and Shapiro originally contemplated that the closing on the sale of Flamingo's Property to Slazer would occur in early January 2008.

69. However, Slazer needed more time and asked Flamingo to adjourn the closing.

70. Subsequently, Flamingo and Slazer entered into a series of adjournment agreements by which Slazer agreed to pay Flamingo a series of monthly fees, and, at times, increases in purchase price, to keep extending the closing date.

71. Slazer agreed to pay $51,562.50 per month, plus, at times, increases in purchase price, to extend the closing – plus real estate taxes and all other expenses associated with keeping the Property in order.

72. Shrem did not inform Wendy's about the extension agreements.

73. Slazer made certain extension payments to Flamingo per the agreed-upon adjournment agreements.

74. From January 2008 through August 2009, Slazer paid to Flamingo $1,415,011.61 in extension payments, which included real estate taxes, water charges, business improvement district charges, and other expenses on the Property, as well as, at times, increases in purchase price.

75. Slazer also paid Flamingo $53,678.39 in legal fees in relation to the adjournments of the closing.

76. These payments from Slazer to Flamingo continued to at least August 2009, and the adjournment agreements continued through at least January 2010.

77. The closing between Slazer and Flamingo on the Property never occurred, and in March 2010, Flamingo terminated its contract to sell the Property to Slazer, and Slazer released the down payment of $1,375,000 to Flamingo.

78. Shrem kept the $1,375,000 down payment on the Flamingo Property from Slazer.

79. Shrem would not have received the down payment or any of the extension payments if Wendy's had not signed the Agreement to Terminate Lease and First Amendment of Agreement to Terminate Lease.

Slazer Demolished the Property

80. As of early 2007, Shapiro claimed that he planned to do construction work at the Property, including removing the higher two floors, to prepare it for a McDonald's restaurant at the Property.

81. As of December 22, 2007, Shrem was aware that Shapiro wanted to remove the top two floors from the Flamingo building to prepare it for a McDonald's in advance of the closing.

82. When asked, whether he was "outraged when [Shapiro] told [Shrem] that [Shrem's] building was gutted," Shrem testified, "I thought I was closing this thing in a month. You're asking me something like that. I thought I'm closing in a month. If they want it, whatever they wanted to do, they could have done at that point in time not with my permission, but whatever they were doing. I'm closing in a month. Okay they're preparing for McDonald's to go in there. I said, 'Fine.' That's it."

83. At some point in or about early 2008, the Property was boarded up and a construction fence built around it, making the Property inaccessible.

84. In 2008, Shapiro signed and filed construction and demolition work applications with the NYC Department of Buildings, listing himself as "Owner" of the Property.

85. Slazer subsequently received several work permits from the NYC Department of Buildings regarding contemplated work on the Property, including demolition of the interior partitions, ceilings, and doors, removal of the last two existing floors, removal of plumbing fixtures and related piping, and installation of ductwork.

86. On March 21, 2008, Michael O'Kane sent an email, which states: "Gentlemen, have you closed on your purchase of 26 East 23rd Street, NY, or more importantly to Wendy's, has the Termination of Lease been filed of record officially terminating the lease between Wendy's and Flamingo?"

87. In 2008, Slazer's third-party contractors began major construction and demolition work on the Property, including removal of the top two floors of the Property, as well as removal of the remaining stories' interior fixtures, finishes, walls, and floors.

88. Shapiro spoke with Shrem regularly during the course of the construction on the Flamingo Property in 2008-2009.

89. Shrem was aware that his building was gutted in order for Mr. Shapiro to prepare it for a McDonalds to go into the space.

90. In 2008, while construction was being done at the Property, Taves spoke with Shrem and saw him in person.

11

91. Taves told Shrem about a construction fence on his Property in 2008.

92. Shrem made no effort to notify Wendy's regarding the destruction of the building when he learned of it.

93. On September 5, 2008, Taves emailed Shrem, inquiring as to whether Mr. Shrem's attorney had contacted Shapiro regarding the construction or pursued a stop work order.

94. Before November 2009, Shrem knew that the whole front of the Flamingo building was ripped out and that the building was boarded up.

95. Shapiro told Shrem that his building at the Property was "gutted" and that Slazer was preparing the premises so McDonald's could move in.

96. When he learned his building had been gutted, Shrem thought he was closing in a month and that they were preparing it for McDonalds, and he said "fine."

97. Shrem never informed Wendy's that the building on the Property had been "gutted."

98. Shrem did not call the police, the City, or otherwise make any attempt to stop the construction on the Property.

Liens Attached to the Flamingo Property

99. As a result of Slazer's failure to make full payment to certain third-party contractors in relation to the construction on the Property, several mechanic's liens have attached to the Property and some may have not yet been discharged.

100. In February 2009, Shrem received notice of a lien placed on the Flamingo Property that showed that between March 2008 and January 2009, Enscon, a contractor, had performed more than $900,000 of work on the Property, including "asbestos removal, demolition, carpentry, roofing, steelwork, masonry, and plumbing."

101. Shrem made no attempt to notify Wendy's regarding these liens at any time.

Flamingo Paid Real Estate Taxes and Related Matters

102. In March 2009, Flamingo paid a New York City tax bill of $190 related to the Property.

103. In July 2009, Flamingo paid approximately $45,900 to satisfy a tax bill associated with the Property.

104. Shrem did not notify anybody at Wendy's to claim that they had to pay the $45,900 tax bill associated with the Property.

105. In April 2010, Flamingo paid a tax bill of more than $60,000 associated with the Property and did nothing to seek payment from Wendy's at that time.

106. A "Property Tax Payment History" available online at the New York City Department of

Finance's website indicates that between February 15, 2008 (for the period beginning January 1, 2008) and January 3, 2012 (for the period beginning January 1, 2012), $413,093.90 was paid for property taxes, illuminated signs, and business improvement district fees in relation to 26 East 23rd Street in New York.

An Easement for a Flue Duct Was Filed on the Flamingo Property

107. In April 2009, a purported easement to Slazer was filed allowing for the installation of a flue duct and related equipment on the roof of the Property to serve the boilers in the One Madison Park condominium complex.

108. Shrem made no effort to notify Wendy's regarding this purported easement.

109. On or about April 28, 2009, Shrem and Shapiro executed a Termination of Easement Agreement.

110. Shrem made no effort to notify Wendy's regarding this Termination of Easement Agreement.

111. Counsel for Flamingo and Slazer also entered into discussions regarding a Temporary Easement Agreement and Repair Agreement.

112. Shrem made no effort to notify Wendy's regarding discussions concerning a Temporary Easement Agreement or Repair Agreement.

Negotiations with McDonald's

113. During 2009, Slazer negotiated the potential sale of the Flamingo Property to McDonald's.

114. Shrem and his attorney, Strelov, were aware of these negotiations, and Shrem attended multiple in-person meetings with Shapiro and McDonald's representatives.

115. In June 2009, Shrem was aware that a permit was issued for a McDonald's sign on the Flamingo Property.

116. Shrem never told Wendy's that McDonald's was going to put its sign up on the Property.

117. The negotiations between Flamingo and Slazer, and Slazer and McDonald's, proceeded all the way to closing negotiations, and Shrem was present at a scheduled closing with McDonald's and Slazer representatives.

118. Flamingo never contacted Wendy's regarding its potential closing with McDonald's.

119. The negotiations between Flamingo, Slazer, and McDonald's fell through in or around the fall of 2009, and a closing never occurred.

Slazer's Foreclosure & Flamingo's "Demand Letter"

120. After the collapse of the real estate market, Slazer and various related entities faced severe

13

financial difficulties.

121. The closing between Flamingo and Slazer was further adjourned to January 29, 2010 but never happened.

122. In February 2010, iStar financial, a lender to Slazer, filed a complaint in New York Supreme Court against various Slazer entities, Flamingo, McDonald's and others (but not Wendy's) to foreclose on certain mortgages on Slazer's condominium building.

123. In March 2010, Enscon, one of the contractors Slazer hired to perform demolition and construction work to prepare the Flamingo Property for an incoming McDonald's, filed a lawsuit in New York Supreme Court against Slazer and Flamingo (but not Wendy's) for alleged fees due for work performed on the Flamingo Property. The action was subsequently dismissed as against Flamingo.

124. In June 2010, an involuntary bankruptcy petition was filed against the debtor Slazer entities in the United States Bankruptcy Court for the District of Delaware.

125. In early 2011, Flamingo filed a complaint for declaratory judgment and other relief in the Delaware Bankruptcy Court against the Slazer entities, seeking, among other things, to remove the flue ducts on the Flamingo Property and rebuild the top two floors.

126. In that complaint, Flamingo acknowledged that it was not until after the iStar foreclosure action and the involuntary bankruptcy petition that it "began to consider other options for the Flamingo Property . . ."

127. Flamingo also acknowledged that it "began efforts to market the Flamingo Property to prospective purchasers or lessees" at this time in 2010.

128. In June 2010, Flamingo, for the first time after Wendy's vacated the premises, wrote to Wendy's, seeking to hold Wendy's liable for alleged back rent and damage to the Property that occurred after Wendy's vacated the Property in early 2008.

129. After receiving the letter from Flamingo's counsel, Michael O'Kane, in-house counsel for Wendy's at the time, sent an email to Shapiro and his attorney, Burt Dorfman, inquiring, "Gentlemen, what happened to the closing?"

130. Almost a year later, in May 2011, Flamingo's current counsel sent Wendy's a purported "Rent Demand Notice."

131. Wendy's responded that it had abandoned the Flamingo Property and surrendered the Lease years prior (and if in fact a lease was held to be valid, Flamingo had breached it).

132. Flamingo subsequently filed a Petition against Wendy's in New York City Civil Court and an Amended Complaint in this Court on August 19, 2011.

That pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, plaintiff, Flamingo LLC ("Flamingo") controverts the following paragraphs set forth in defendant Wendy's Summary of Undisputed Facts:

Paragraph 12 is incomplete in that Shrem wanted Wendy's to give up its rights under the lease but to be effective only at the time of the closing of the Flamingo Property with Slazer. (Pretrial Order: Stipulated Fact No. 37.)

Paragraph 16 is incomplete in that Wendy's agreed to vacate the property and terminate all rights under the Lease but effective only at the time of closing between Flamingo and Slazer. (Pretrial Order: Stipulated Fact No. 37; Yecies Exhibit "G")

Item 30:

Paragraph 30 is incomplete, as it fails to set forth that the termination of lease with Slazer would take effect only at the time of closing. (Yecies Exhibit "M")

Paragraph 31 is erroneous, as Wendy's did not surrender the property to any entity, but assigned all of its obligations under the lease to Slazer. (Pretrial Order: Stipulated Fact No. 50; Yecies Exhibit "M")

Paragraph 40 is false in that the deposition testimony cited by Wendy's fails to support its allegation that Shrem was "not outraged" that his building has been "gutted". (Shrem deposition at p. 478, lines 3-12)

Paragraph 44 is misleading because at the time it vacated the premises, Wendy's had already assigned all of its rights under the Lease to Slazer and had no intention to return. (Pretrial Order: Stipulated Facts Nos. 50 and 57)

Paragraph 71 is false, as Wendy's never surrendered the premises in early 2008, as it vacated the premises and assigned the lease to Slazer. (Pretrial Order: Stipulated Facts Nos. 50 and 128; Yecies Exhibit "M")

Dated: Port Washington, New York
June 6, 2012

/s/Bruce Yukelson
Bruce Yukelson
byukelson@wolfeyukelson.com
WOLFE & YUKELSON PLLC
14 Vanderventer Avenue, Suite 101
Port Washington, NY 11050
(516) 767-7100

Attorneys for Plaintiff Flamingo LLC